IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CASE NUMBER |
| | ) | 1:26-CR-149-VMC-JEM |
| MATTHEW SOUZA | ) | |
| Defendant | ) | |

### SENTENCING MEMORANDUM OF MATTHEW SOUZA

In pursuit of a just and reasonable sentence, MATTHEW SOUZA, by and through undersigned counsel, submits this sentencing memorandum.  Having pled guilty on June 11, 2026, to two counts of making threatening communications, in violation of 18 U.S.C. § 875(c), (Doc. 21), Mr. Souza now asks the Court to impose a time served sentence, followed by a period of supervised release.  While that represents a variance below the Guideline range, a time-served sentence is justified by the 18 U.S.C. § 3553(a) sentencing factors, particularly the history and characteristics of the defendant and the need to foster his continued rehabilitation.  Matthew Souza is a loving son and brother, a devoted partner to his fiancé, and eagerly expectant father.  Matthew held biased beliefs and conveyed horrible messages in this offense, a year ago.  But he has learned from his mistakes, reoriented his perspective, and is now committed to devoting himself to family and community in a positive way.  Federal supervision will support that, and no additional jail time is necessary.

1

## Background Information

Matthew Souza was born in Belo Horizonte, Brazil, on July 5, 2001. Matthew recently celebrated his 25th birthday, while in custody at the Robert A. Deyton Detention Facility (hereinafter "RADD"); at the time of the offense conduct, though, he was just 23 and 24 years old.

Matthew is oldest of three brothers. His younger brother, Marcus Souza, is aged 20. Marcus works as a server at a restaurant called Buffalo Café. He is creative and artistic, and has a passion for theatre. Matthew and Marcus are opposites in many ways—Matthew conservative, Marcus liberal; Matthew introverted, Marcus more extroverted—but the two love and support one another despite their differences. Matthew's youngest brother, Lucas Souza, is just 4 years old (Matthew's parents had Lucas late in life). Lucas is autistic and nonverbal, requiring specialized attention from caregivers. Prior to his arrest, Matthew visited his parents weekly and helped a great deal with Lucas. Though Matthew has a positive relationship with both his younger siblings, he is especially close with, and attentive to, Lucas—almost a third parent for the young boy.

Matthew spent his early childhood years in Brazil, where Matthew's father, Ray Souza, worked as a church pastor and Matthew's mother, Rachel Souza, worked as a teacher. Ray was Brazilian and grew up poor, in the favelas. Rachel

2

also grew up in Brazil, but she was born in the United States and her parents were U.S. citizens. Rachel's parents, Mark and Paula, were Christian ministries who moved to Brazil to establish a church and school in Belo Horizonte. There, Ray and Rachel met, married, and had Matthew and Marcus. Ray pastored the church, and Matthew and Marcus attended the private Christian school, that Mark and Paula founded. From the beginning, the family was close knit and loving.

The family decided to move to the U.S. in July 2010, when Matthew was nine years old. The family felt called by God to move to the U.S., but they also sought a better life for Matthew and Marcus. In Brazil, although Matthew's family lived in a clean and stable apartment—nicer than the homes his cousins lived in and dad had grown up in, in the favelas—still the family was surrounded by violence and poverty. Matthew's parents did not allow him leave the apartment because of the dangers in the area. The U.S. offered a significantly safer environment for the kids, with more opportunities.

Matthew's family originally immigrated to Monongahela, Pennsylvania, a suburban city connected to Pittsburgh. They moved in with Rachel's parents, Mark and Paula, who had returned to the U.S. some years before. But Matthew's dad, Ray, struggled to find a job in the Pittsburgh area; so after six to eight months the family moved again to northeastern Maryland. There, Ray found a job as a pastor at Life Community Church, and the family stayed three or four years, until

3

the summer of 2014. That's when the family relocated yet again, this time to Gwinnett County, Georgia. The family came specifically to get connected to Gwinnett Church, led by popular mega-church pastor Andy Stanley.[1] Though Ray failed to secure a pastoral position at the church, the family nonetheless joined and got very involved with Gwinnett Church. Ray pursued other jobs until he founded the church for which he now serves as co-pastor: Good News Church, in Buford.[2] Rachel was also able to support the family through her work as a parent liaison and translator at a school. Today, Ray and Rachel live in a large house in Buford, with Matthew's brothers, Marcus and Lucas, and Rachel's parents, Mark and Paula. The family is very closely connected.

Despite the eventually positive results of the family's journey, the multiple moves caused difficulties for Matthew's development and brought associated trauma. Matthew could not speak English when he first arrived in the U.S.. He had been academically successful in Brazil, but in the U.S. he struggled to understand and keep up with classmates. His grades suffered, and he faced bullying from classmates. Just as he began to get used to his new environment in Pennsylvania, his family relocated again to Maryland and Matthew had to start the struggle all over. He got in fights, largely arising from his language barrier.

---

[1] *See* https://gwinnettchurch.org/.
[2] *See* https://goodnewschurchga.com/.

While in the fifth grade, Matthew was twice jumped and beaten up by groups of other kids. Additionally, while walking with a friend one day the friend was attacked by a group of older teenagers, with guns pointed at both boys. Matthew could only watch as his friend was severely beaten and later had to go to the hospital. More than any physical effects, these events instilled emotional and psychological trauma in Matthew. And the repeated family moves—especially after the family moved to Georgia, when Matthew was 13—led Matthew to develop feelings of anxiety, anger, and depression. Multiple studies have found that such conditions commonly arise after individuals have experienced multiple moves in childhood and teenage years.[3]

Instead of getting proper therapy or treatment for these negative emotions, Matthew put his faith and sought self-esteem in friends and girlfriends. Teenage Matthew also began to smoke marijuana. As he put it, "I started smoking and scrolling too much, and that took me away from the family and positive interests." He felt ashamed, and still regrets, that he did not focus more on his younger brother, when Marcus was going through struggles, or on the hobbies he had

---

[3] *See, e.g.,* University of Plymouth, *Multiple Moves During Childhood Can Increase the Risks of Depression in Later Life*, SCIENCE DAILY, available at www.sciencedaily.com/releases/2024/07/240717120958.htm (accessed July 10, 2026); *Moving Repeatedly in Childhood Associated with Poorer Quality of Life Years Later*, American Psychological Association, available at https://www.apa.org/news/press/releases/2010/06/moving-well-being (accessed July 10, 2026).

previously enjoyed, like reading fiction and learning in school. Matthew never received treatment or any formal diagnoses for his anxiety or trauma effects.

After high school graduation, and especially in the months leading up to this offense, Matthew immersed himself in social media and encountered social media influencers who presented emotionally-charged, right-wing perspectives on the world. Though Matthew had friends who were Jewish and Black, he allowed himself to be influenced by Youtubers and influencers who propagated racist and prejudicial views. Matthew did not plan or take any steps to hurt anyone, but he did make comments on social media and to friends that were racist and violent in nature. He regrets that now tremendously.

Matthew's young adult life has not been wholly or even predominantly negative, however. He has continued to remain very close to his family. Especially after the birth of his younger brother, Lucas, Matthew contributed to his family by helping care for and spend time with Lucas. He moved in with his parents for the first two years of Lucas' life, to help care for the baby. And after Lucas' autism diagnosis, Matthew helped research and obtain resources so that Lucas could thrive and develop as much as possible. Matthew still (prior to his arrest) visits his parents and family every week, and he is active in the life of Lucas, and his young cousins. Matthew did not pursue university education, but he did get jobs, including at Racetrack, and he studied investments to become a stock

trader.  Prior to his arrest, stock trading allowed Matthew to earn enough to support himself, and he wants to continue developing that career.

Following his arrest in March 2026, Matthew has reflected on his biased thinking and taken substantial steps to shift his perspective.  Before and since his arrival at RADD, Matthew has read books about Judaism, and he has developed a sincere appreciation for Jewish religion, philosophy, and culture.

Matthew's perspective has also been transformed by his relationship with his fiancé, Nicole Kirilova, and their growing family.  Matthew and Nicole started dating in the summer of 2025.  When they found out she was pregnant, Matthew moved in with Nicole and her parents, Nataliya Ilieva and Mariyan Zahariev, to better support Nicole.  Since moving in with Nicole's family in late 2025, Matthew has become close with Nicole's parents and contributes to the housework, including doing the brunt of renovation work currently going on in the house. Nicole and he are excited about the arrival of their son, Jonathan, who is expected in late July or early August.  For Matthew, the relationship with Nicole and recognition of fatherhood has drastically shifted his focus:  making his first and only priority the care and nurturing of Nicole, their baby, and their larger family. As Nicole faced some complications in the early stages of the pregnancy, Matthew got involved in her prenatal care and medical journey, driving her to appointments and supporting her through all challenges and steps.  He wants

desperately to be there for the late stages of pregnancy and birth of their son—a once-in-a-life time moment for him as a father, but also a time in which Nicole will need his support.

## Argument for a Reasonable Sentence

*The Sentencing Guideline Range*

The Presentence Investigation Report ("PSR") calculates Matthew Souza's total offense level as 20. (PSR at ¶ 97). This is based upon (1) a base offense level of 12, pursuant to U.S.S.G. § 2A6.1(a)(1); (2) a suggested 6-level upward adjustment, pursuant to § 2A6.1(b)(1), because the offense purportedly involved conduct evidencing an intent to carry out the threat; (3) a 2-level increase, under § 2A6.1(b)(2)(A), because the offense involved more than two threats; (4) a 3-level addition, under § 3A1.1(a), because the defendant allegedly selected one or more victims "based on their race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person"; and (5) a 3-level downward adjustment for acceptance of responsibility, pursuant to § 3E1.1(a) and (b). (*Id.* at ¶¶ 80-97). The PSR correctly notes that Matthew has no prior criminal convictions and thus no criminal history points; he is in criminal history category

I.  (*Id.* at ¶¶ 100-102).  This PSR's total offense level and criminal history category yield a Guideline sentencing range of 33 to 41 months.  (*Id.* at Part D, p. 28).

The adopted Guideline range should be lower than this, however, because no upward adjustment should be applied under § 2A6.1(b)(1), for conduct showing intent to carry out threats, or under § 3A1.1, for selection of victims based on their racial, religious, or other identity.  Without these enhancements, the correct offense level is 12, and the resulting Guideline range is and should be 10 to 16 months.  We will now address each of these Guideline objections in turn, before explaining why a time-served sentence is justified by 18 U.S.C § 3553(a).

I.       No enhancements should be applied based on evidence of intent to carry out threats.

Because Matthew did not take any actions to carry out threats, nor any actions reflecting an *intent* to carry out threats, the Court should decline to apply the PSR's proposed 6-level enhancement under § 2A6.1(b)(1).  To that end, we object to Paragraphs 81 and 88 of the PSR.  Counsel for the Government, Assistant United States Attorney Conor Woods, has informed the Defense that the Government does *not* oppose our objection to this enhancement.  Since it is the Government's burden to establish evidentiary basis for the enhancement—to prove both that acts were performed *and also* that such acts evidenced a malicious

intent to carry out threats—absent presentation of evidence and argument from the Government to support the enhancement, the enhancement should not stand.

Nevertheless, we will address the PSR's suggested basis for the enhancement. It identifies Matthew's purchase of three firearms and body armor, at a Lawrenceville, GA, gun show on March 8 2026, as the conduct evidencing an intent to carry out threats. (PSR at ¶¶ 81, 88). However, that purchase of firearms was wholly disconnected from and unrelated to the threatening communications that Matthew had earlier conveyed. A number of points and pieces of evidence show that lack of connection (between gun purchases and threats) and lack of any intent to carry out threats.

First, Matthew's purchase of guns at the Lawrenceville gun show came eight months after the threatening communications identified in the indictment, and three months after the last known antisemitic or racially offensive message. (*See* PSR at ¶¶ 2-3, 21). The period of time between those prior messages and that latter gun purchase was a period of immense change in Matthew's life, with a shift in perspective and goals. During that time period, Matthew developed a relationship with the love of his life, got engaged, moved in with his fiancé, learned and prepared for a baby to be born, and devoted himself to caring for Nicole and assisting her family with their household. Matthew did not take any steps to act on his threatening messages and his actions in the months following the messages

show that he had no intent to harm anyone. Instead, he was devoting himself increasingly to family and new parenthood.

Second, Matthew's purchase of guns reflected an interest in guns and self-defense that was long-standing, extant in Matthew long before 2025, conveyed the threatening communications in this case. To put it frankly, Matthew was a gun guy. He liked guns. He thought they were cool. He believed in the 2nd Amendment as a patriotic sign and important right. He believed in self-defense and thought he outght to have guns to protect his family. These are beliefs that are shared by millions of Americans. Body armor is less common than ordinary firearms, but body armor appeals to a great many young people—and especially appeals to a 24-year-old boy—for similar reasons that firearms appeal to those individuals. It's a cool toy. It reflects a desire for self-defense. The fact that Matthew purchased guns and body armor at the gun show does *not* tell us what he intended to do with those items, with any particularity, but the purchase could have been motivated by and associated with whole hosts of innocent, even admirable intentions and plans. In fact, that was the case here: Matthew's purchase reflected a general interest in guns and concern for self-defense.

Supporting this point is the fact that Matthew had purchased guns at gun shows previously, well before 2025. Matthew had a recreational interest in guns, and liked to keep them both for target shooting and for self-defense. When

11

arrested in Florida on March 9, 2026, while vacationing with his fiancé, Nicole, Matthew did not have any of the guns that he had purchased at the gun show on March 8th. Clearly, then, he had not rushed to purchase the gun show guns so that he could go out and use them or carry out any threatened violence. Rather, he took all the purchased guns and the body armor back to his house and put them in a closet. (See PSR at ¶ 57). He gave one of the guns to Nicole, as a gift for her to use for *her* own protection. (*Id.* at ¶ 48). Then, Matthew was found with a wholly separate gun when he was arrested in Florida. This was a small hand-gun, a .40-caliber pistol, kept for his and Nicole's protection while traveling. (*Id.* at ¶ 45). Nothing about the gun show gun purchase, the post-purchase behavior with the guns, or the trip to Florida, reflects or evidences that Matthew was carrying out or intended to carry out an act of violence. To the contrary, the purchase of guns and his behavior with the guns shows that he was buying them for lawful purposes and with lawful intents, wholly unrelated to the threatening communications made the previous year.

Third, affirmative testimony from Matthew and people who knew him shows that he did not have any intent, nor did he make any plans, to commit violence or otherwise hurt any individuals. At the time of his arrest, Matthew readily admitted and honestly disclosed that he had conveyed threatening messages and posts. Nothing suggested that he hid anything from agents or was

12

dishonest in any way; he even told agents about concerning online activity he engaged in about which they did not previously know. (*See* PSR at ¶¶ 51-56). In the course of this forthright admission, Matthew told agents that he had no intention to hurt Jewish people, attack any synagogue, or commit any violence. (*Id.* at 53). He honestly revealed his intent—or lack thereof. Other people, including Matthew's dad, Ray, told agents that Matthew had never said anything that reflected a desire or plan to commit violence. (See *id.* at 30). And Jacob Etheridge, Matthew's former roommate, with whom Matthew engaged in racially charged, antisemitic, and homophobic conversations, told agents that he and Matthew never discussed carrying out a threat against any group or person. (*Id.* at 72). Thus, affirmative witness and testimonial evidence shows that Matthew did *not* have any intent to carry out a threat.

Finally, it is legal to purchase and possess firearms. Matthew was not a prohibited person at the time of the 2025 offense or the 2026 gun purchase; rather, he was a citizen with full rights to buy and keep firearms. While he may have made a mistake regarding the proper address he was supposed to put on the purchase forms (based on instructions from the seller), he went through a lawful process to buy the firearms. (*See* PSR at ¶¶ 38-42, 52). Likewise, guns that he had previously purchased were bought and possessed lawfully. They weren't stolen, bought off the street, unmarked or untraceable. They weren't purchased or

13

possessed in a way that reflected an intent to conceal the guns or use them surreptitiously.   Rather they were purchased publicly, according to the lawful process, and they were stored safely within Matthew's home.

II.     No enhancement should be applied based on the defendant selecting victims due to their identity.

Matthew did not intentionally select any victim as the object of the offense because of their race, color, religion, or other identity trait of any person; therefore no enhancement should be applied under § 3A1.1(a).  Specifically, we object to Paragraphs 83 and 90 of the PSR.  This enhancement is not appropriate for a number of reasons:

First, neither the Government nor the PSR have identified any particular victims of the offense.  The threatening communications that Matthew conveyed referred to Jewish people generally, not to any selected individuals or even an identified group of individuals.  This does not make the communications any less condemnable or offensive—they are both—but it means that there is a necessary element to this enhancement that is lacking.  To apply § 3A1.1(a), the Court would need to find that Matthew "intentionally selected any victim … as the object of the offense of conviction" because of the identity trait of that person.  But while warnings might have been sent to synagogues based on Matthew's concerning posts, Matthew did not mention, identify, or direct his remarks to any synagogue, group, or individual.  He posted comments on a public speech and messaging

14

platform, X, for his followers, and possibly members of the public, to see.[4]  The lack of any identified victims suggest that there may have been no actual victims of this offense.  We do not actually know if any particular Jewish people read any of Matthew's posts.  In that case, the enhancement of course cannot apply.  But even if the Government *were* to identify some particular victims, it would need to also show that Matthew himself knew — and "*intentionally selected*" — those victims as "objects of the offense."  Instead, Matthew made general posts, accessible to his followers and/or the public, and with no identification or selections of victims who might be harmed by the communications or who might perceive the threat of injury.

Concluding that a threat to Jews generally makes every Jewish person a victim is an untenable and unreasonable leap, inconsistent with the requirements of the statute of conviction and the Guideline provision in § 3A1.1.  If I were to post a message stating "Maryland I'm coming for you!" could all Maryland residents now be considered selected victims, 18 U.S.C. § 375(c) or U.S.S.G. § 3A1.1?  When the great Miles Davis said, "if I had an hour to live, I'd spend it

---

[4] It is not clear from the evidence whether Matthew's posts were publicly accessible, or only available to Matthew's social media followers.  If they were private messages, accessible only to followers, then it is even more likely that there were no victims of this offense, i.e. no actual Jewish people who read and perceived threatened injury from the messages.  Without Government-provided evidence regarding this issue, there is insufficient evidence to establish the existence of victims.

choking a white man, nice and slow," did all white men in the world become selected victims? Would § 3A1.1 be applied in his conviction and sentence? No, these threatening statements, like Matthew's messages, are general in nature and without any particularly targeted victims. As such, the Court cannot find that Matthew intentionally selected any victims on the basis of their identity.

To support application of this § 3A1.1 enhancement, the Government bears the burden of proving that Matthew identified and directed his comments at victims. Then the Court must find, *beyond a reasonable doubt*, that the defendant "intentionally selected any victim." The Government also bears the burden of proving that Matthew selected those victims precisely on the basis of their identity, or precisely because of their identity. Only if the Court finds beyond a reasonable doubt that this was Matthew's motive can the enhancement be applied. He can't have posted the messages to gain attention. He can't have made the statements to provoke political or social debate. He had to select victims, to harm or scare them because of those victims' identity. Not only has the Government not shown that Matthew intentionally selected particular victims, but it has not presented any evidence to show what Matthew's motive was behind the posting of communications. We've admitted here that Matthew had biased views at the time of this offense, but that does not prove that his intention behind the posts was to convey threats to selected individuals on the basis of *their* identities. He could

16

have made anti-Jewish statements for a variety of other reasons.  And he could have—perhaps did, with his twisted perspective at the time—post the messages with no intention for them to be read by actual Jewish people, but only by other non-Jewish people who might agree with him.  Regardless, the Government would need to present evidence of his victim selection and his harmful intent, and the Court would need to find that he selected victims and had the intent beyond a reasonable doubt.  That hasn't happened and should not happen in this case.

### *Consideration of the § 3553(a) Factors*

The sentencing factors to be weighed, pursuant to 18 U.S.C. § 3553(a), support the imposition of a time-served sentence, followed by supervised release. First, the history and characteristics of Matthew Souza show that this offense, while serious, does not reveal a criminal who needs to be incapacitated and locked away from society.  As the attached support letters reflect, Matthew is overwhelmingly a responsible, kind person—the type of person who cares for others and upon whom other people rely.[5]  He is a loving partner to his fiancé, Nicole, supporting her in her journey of university education and through her pregnancy.  He is a devoted son and older brother, who visits his family regularly, contributes to their financial well-being, and helps care for the youngest family member, who has high-level autism and special needs.  He is kind to people he

---

[5] *See* Attachment A, *Letters of Support*.

17

meets and, in his actual life (rather than online) tolerant of people different than him.    Matthew contributes much more than he takes from society, and notwithstanding his horrible decisions to convey threatening communications, Matthew is continuously improving as a caring citizen and person.

Considering the circumstances of this offense, we must acknowledge that his messages were disturbing, offensive, and wholly inexcusable. They were also factually inaccurate, reflecting a misunderstanding of the world and how groups of people interact within society.  Matthew was not communicating from a properly informed place, understanding history and actual demographic data. Instead, Matthew was informed and influenced by social media personas who made false, alarmist claims and prejudicially labeled and described Jewish people and people of color.  Matthew is himself an immigrant, from Brazil, and had diverse friends, so he should have rejected the messages that social media presented.  But as a young person—just 23 and 24 at the time of the offense—with untreated mental health issues, Matthew was susceptible to the influence of right-wing conspiracy theorists, stoking anger, fear, and hate.  Matthew's background of trauma and developmental challenges—particularly arising from family moves

18

and social bullying—also explain why he was especially susceptible to ideological claims based on fear of the other.

Notwithstanding the disturbing, concerning, and offensive nature of Matthew's offense, it solely consisted of words. Matthew did not take any actions to hurt anyone. Nor did he ever *intend* to hurt anyone, or commit any unprovoked violence. Matthew has taken responsibility for his conveying threatening communications, but he has also maintained, truthfully, that the communications were no more than communications. Furthermore, Matthew stopped posting such messages in late 2025, well before his arrest in March 2026. The process of personal change began then, when Matthew found out that Nicole was pregnant and moved in with her family.

The above considerations also show that a time-served sentence, followed by supervised release is sufficient to punish Matthew, afford adequate deterrence, and protect the public. Matthew has already learned from this prosecution and has a clear understanding that even words, when violent or racist in nature, have real harm and can be criminally sanctioned. He has taken steps to improve his mental and emotional state, such that he no longer holds the same biased views and will no longer be influenced by the hateful ideology of social media influencers. Instead of blaming Jewish people for the world's problems, Matthew is now studying Judaism, to learn from the wisdom of that religion and culture.

Likewise, Matthew recognizes that his white supremacist perspective was wholly false, ignorant, and dangerous. Instead of collecting hateful opinions of groups of people, Matthew is now committed to engaging different people in a loving way, as his family's Christianity prescribes.

Matthew has no prior criminal history, and though this offense reflects a dark direction toward which his mind descended, Matthew is now moving in a much more positive direction. With his fiancé, Nicole, and soon-to-be son, Jonathan, Matthew considers family his sole and highest priority. Even at the time of the offensive communications, Matthew would never have risked his family and life by committing an act of violence. But now he is even more committed to being a stable source of support for his family and a positive role model for his son. He will not commit any offense like this ever again.

A sentence of time served, followed by federal supervision, will promote Matthew's rehabilitation, which is already well underway due to Matthew's own initiative. By requiring and allowing Matthew to engage in mental health treatment, to address trauma and negative emotions for which he has never received care, supervision will help Matthew to better manage his emotions and resist (or ignore) negative ideological messages. The therapy that Matthew wants and needs will be available in society, while Matthew is under supervision; whereas it is not available in jail or prison. Thus, ending Matthew's custodial

20

sentence now, and putting him on supervised release is the next logical, proper step to helping him improve as a citizen and person.  Simultaneously, that is also the best way to protect the public and deter future offenses.  In short, a time served sentence, with supervised release, will meet the goals of sentencing under § 3553(a) while enabling Matthew to support his fiancé and care for his son in this crucially important stage of life.  It will return Matthew to his supportive family, while ensuring that Matthew continues to develop into a loving, positively contributing person—the person he is at his core, and who he is meant to be.

**<u>Conclusion</u>**

For all the reasons presented above, and to carry out justice *sufficiently* and *effectively*, we ask the Court to impose a sentence of time served, followed by a period of supervised release.  Such a sentence is adequately punitory while also giving Matthew Souza the opportunity to get treatment, support his fiancé and coming child, and continue to move his life in a healthy, law-abiding direction.

Respectfully submitted, this 10th day of July, 2026,

> *<u>/s/ Ross Brockway</u>*
> Ross Brockway
> Georgia Bar No. 490836
> Attorney for Matthew Souza

Federal Defender Program, Inc.
101 Marietta Street, N.W., Atlanta, Georgia 30303
(404) 688-7530 [Phone]; (404) 688-0768 [Fax]
Ross_Brockway@FD.org

21